466 S.E.2d 417

**Deborah ADKINS, Plaintiff Below, Appellant,**

v.

**Mark FOSTER and Kathy Giauque, Defendants Below, Appellees.**

No. 22839.

Supreme Court of Appeals of West Virginia.

Submitted Oct. 3, 1995.

Decided Dec. 7, 1995.

Michael C. Allen, Barbara H. Allen, Allen & Allen, L.C., Charleston, for Appellant.

Mary H. Sanders, Huddleston, Bolen, Beatty, Porter & Copen, Charleston, for Appellees.

PER CURIAM:

A jury in this action found that the appellant, Deborah Adkins, was entitled to no damages for personal injuries allegedly sustained in a car wreck on June 21, 1986. In the present appeal, the appellant's principal assertions are that the trial court should have awarded her a new trial after the return of the verdict and that the court erred in submitting a defective verdict form to the jury. After reviewing the record filed and the questions raised, this Court disagrees and cannot find that the trial court committed reversible error. The judgment of the trial court is, therefore, affirmed.

On June 21, 1986, Mark Foster, a drunk driver, "rear ended" an automobile in which the appellant was a passenger. As a result, the appellant suffered neck injuries, and because of those injuries she instituted the present action for damages in the Circuit Court of Fayette County. The case was initially tried before a jury, and on May 8, 1991, that jury returned a verdict for the appellant in the amount of $222,133.00. The Circuit Court of Fayette County subsequently rendered judgment on that verdict.

The appellees here appealed the circuit court's judgment to this Court after the prior trial. In *Adkins v. Foster*, 187 W.Va. 730, 421 S.E.2d 271 (1992), we reversed on the issue of damages and remanded for a new trial while finding that the liability of the appellees was adequately proven. We indicated that, in the absence of special interrogatories to the jury, it was not possible to determine whether the jury awarded the appellant damages for future economic loss or other factors. We also suggested that under the record then available to this Court we could not ascertain whether the verdict was based on pain and suffering or speculative testimony on future economic damages. We concluded that the judgment, insofar as it related to damages, should be reversed, and we remanded for a new trial on the damage issue. We stated:

> Our conclusion that this matter should be remanded on the issue of future economic damages is based upon our belief that the appellee presented significant evidence of permanent injury but failed to present evidence of future economic ramifications of the injury to a reasonable degree of certainty. Upon remand, the permanency of the appellee's injury, as proven in the previous trial, should be presumed, and evidence of future economic loss should be presented to permit a reliable calculation of economic loss.

*Id.* at 736, 421 S.E.2d at 277.

It appears that between the time of the first trial and retrial on remand, a substantial deterioration of the appellant's medical condition occurred and that the appellant underwent additional medical examination and treatment.

In preparing for retrial, the appellees investigated the medical evidence generated after the first trial and learned certain things not previously known. For instance, the appellees learned that a knee injury sustained by the appellant at work prior to the 1986 auto accident was substantially disabling and possibly impacted on her future earning capacity. They also learned that the appellant had been diagnosed as suffering from cervical dystonia, a neurological condition of the neck of apparently non-traumatic origin.

As the second trial approached, the appellees felt that the fact that the appellant had cervical dystonia, or the non-traumatic neck condition, was of particular significance in light of the fact that she was seeking damages for the trauma to her neck arising out of the car accident. Therefore, the appellees moved that they be permitted to introduce evidence of the cervical dystonia. The trial court denied that motion.

During the actual retrial, the appellant introduced evidence suggesting that she had previously worked both as a truck driver and as the lead singer in a band and that she had earned substantial income prior to the auto wreck. Her evidence also indicated that she was unable to perform these jobs because of the disability arising out of the auto accident.

The appellant called as a witness Daniel M. Selby, a C.P.A., who gave economic testimony that the average truck driver in Raleigh County made $21,459.00 in 1992, and through elaborate calculations he postulated that the appellant had an income capacity that amounted to $327,348.00 over the rest of her life.

The appellant also introduced evidence suggesting that her ability to enjoy life was markedly impaired by the residuals of the accident, including a marked neck deformity, which was characterized as "torticollis". This evidence included the testimony of Gloria Alderson, a rehabilitation specialist. Ms. Alderson testified that the vocational skills which the appellant had developed had been negated by her physical impairment, and her ability to compete in the job market was very poor. She also expressed the opinion that the appellant was permanently and totally disabled and that her rehabilitation potential was very poor. Ms. Alderson testified that appropriate care for the appellant in the future would include a rehabilitation psychological examination (cost: $3,500.00); a physical therapy evaluation once a year for life (cost: $120.00 per year); occupational therapy (cost: $120.00 per year for life); frequent orthopedic examinations (cost: $160.00 per visit); general medical care to deal with such things as colds, flu, etc. (cost: $200.00 per year); psychiatric care once a month (cost: $60.00 per visit); a psychiatric behavior modification program every two years (cost, broken down on a yearly basis: $2,500.00); and psychiatric family and group counseling (cost: $1,375.00 per year). Ms. Alderson also stated that the appellant would need a rehabilitation specialist on various types of equipment such as hand-held shower massage, an overbed table, an electric toothbrush, and a "whirlpool hydro-therapy", and various other things including various medications, for all of which she gave cost estimates. She also indicated that the appellant should have attendant care for life at the cost of $33,320.00 per year.

Through the economic testimony of Daniel M. Selby, the appellant advanced a "life care plan" which incorporated the suggestions of Ms. Alderson. That plan indicated that a jury award of $1,528,888.00 would be required to compensate her for the losses sustained in the car wreck.

Apparently as a matter of trial strategy, the appellant did not introduce evidence of the out-of-pocket cost of any treatment directly and exclusively related to the accident.

The appellees, through their attorney, closely cross-examined the appellant and injected into the trial some question as to her veracity and forthrightness. For instance, through introduction of the appellant's social security records, the appellees elicited admissions that her actual earnings over the years were not great. They showed, for instance, in 1975 the appellant had earned $739.00; in 1976, $661.00; in 1977, nothing; in 1978, $402.00; in 1979, $2,929.00; in 1980, $2,187.00; and in 1981, $5,171.00. They also adduced evidence suggesting that the impact of the 1986 auto accident was not as great as

the appellant's evidence suggested, and they elicited an admission that in 1987, after the 1986 auto accident, the appellant had actually worked more hours than she had worked in any previous year and that in 1987 she earned $17,686.00, more than she had earned in her entire life prior to the accident.

To buttress their case, the appellees called as a witness Joe Hammond, a man with whom the appellant had lived for four or five months after the accident. He testified that the appellant continued working as a singer after the accident and she stopped only when the band with which she was singing dissolved. He also testified that the appellant was considering starting her own band.

In addition to impugning the appellant's testimony relating to loss of earning capacity and inability to work due to the auto accident, the appellees introduced evidence suggesting that the bulk of any disability that the appellant did have was attributable to the work-related knee injury which she suffered before she was involved in the auto wreck. Additionally, although precluded from introducing medical evidence that the appellant was suffering from cervical dystonia, the appellees produced substantial medical evidence suggesting that the neck symptomatology which the appellant was demonstrating was medically inconsistent with the objective medical findings demonstrated after the wreck. For instance, Dr. David Bucholz of Johns Hopkins University reviewed the appellant's medical records and testified:

Q. Dr. Buchholz, ... based upon your knowledge that there was no complaint at the time of the accident ... that she didn't seek care ... and your review ... of these records ... are all of these records combined consistent with any serious structural damage?

A. No, they are not.

Q. Now, there have been radiographic studies done on numerous occasions up to 1990 on Ms. Adkins's cervical spine, have there not?

A. That is correct.

Q. And have you had an opportunity, Doctor, to review these radiographic studies?

A. Yes. The reports and the films.

Q. Okay. And how many different radiographic studies have you been able to review, and the kinds? Are they x-rays, CT scans?

A. I don't recall how many of these I've seen with my own eyes, but I believe it's the majority. The list that I have here of the number of tests that she's had, various x-rays, CT scans, MRI's, myelograms of various parts of the spine and the head totals twenty-two.

Q. Okay. Does that include some of the lower back, also?

A. Yes. She's had lumbar spine x-rays, CT scan, MRI and myelography with CT scan.

Q. Okay. Were any of those abnormal?

A. No.

Q. The CT scan with myelogram that was done at West Virginia University Hospital by Dr. Bloomfield, have you reviewed that?

A. Yes.

Q. And was that—in that report or any of the other radiographic reports, was there any evidence of any damage to the—the muscles and ligaments of the cervical spine?

A. No. That study was entirely normal.

Q. Was there ever any indication whatsoever in any—any record up to 1990 that there was any fracture?

A. No.

Q. Was there any evidence in any of the records you reviewed up to 1990 that—well, up to 1989, that there was ever any neurological problem?

A. No.

Q. Was there ever any neurological findings?

A. No, there was not.

At the conclusion of the evidence, the appellees' attorney essentially argued that the appellant was not nearly as disabled as a result of the accident as she claimed and suggested that the damages sought were extremely exaggerated and far exceeded any

actual loss. To buttress this argument, counsel pointed to the testimony of Joe Hammond, which suggested that the appellant was not seriously injured after the accident, and said: "I think Joe was an honest witness." Somewhat similarly, to focus on the quality of the appellees' medical experts and their opinions, counsel argued, over the objection of the appellant's attorney:

> ... [a]nd if it were you who were being sued by somebody, ... and someone was wanting to pay ... wanting you to pay for their wages for the rest of their life, wouldn't you want that person evaluated in the best hospital on the east coast by the best specialists? Wouldn't you want that?

When the case was ultimately submitted to the jury, the trial court gave the jury a special verdict form which read as follows:

> We the jury find for the Plaintiff, Deborah Adkins, and award damages as proven by a preponderance of the evidence were proximately caused by the automobile accident of June 21, 1986, and assess those damages as follows:
>
> Special damages include the following:
> Future lost wages, if any    $_____
> Future medical and care costs, if any    $_____
> General damages include the following:
> Pain and suffering, if any    $_____
> Loss of ability to enjoy life, if any    $_____
>      TOTAL DAMAGES    $_____
>
> _____
> Jury Foreman

In submitting this form, the Court refused to submit a form provided by the appellant. The appellant's verdict form said:

> We, the jury find our verdict for the plaintiff and award her damages as follows:
>
> Cervical strain and sprain
> Chronic pain resulting therefrom
> Aggravation of pre-existing depression
> Torticollis, and Disfigurement    _____
> Loss of enjoyment of life
> Mental pain and suffering    _____
> Future costs of care    _____
> Lost earnings to date    _____
> Future lost earnings    _____
>
> _____
> JURY FOREPERSON
>
> _____
> Date

After the jury received the court's verdict form, it retired to deliberate, and after delib-

erating it found that the appellant was entitled to no damages and placed a "0" in each of the dollar slots on the verdict form.

Upon return of the verdict, the appellant moved for a new trial on the ground that the verdict was manifestly inadequate. The trial court conducted a hearing on the motion. At the conclusion of that hearing, the court stated:

> ... I think one of the problems the plaintiff had in this case was that the plaintiff made no claim for any out-of-pocket expenses and no claim for any lost wages which would set the stage for this jury to see that there's some—something of a loss.
>
> It was all dealing with future losses, and I just thought that that was—had some way to maybe create a mind-set for the jury. There were no claims for—as I said, doctor bills, or hospital bills, or prescription bills, or any other out-of-pocket expenses or lost wages, and I think that is a problem in how the case was presented.

The court also went on to note that the appellant's witnesses were ineffective and damaged on cross examination. Relating to the testimony of Gloria Alderson, the rehabilitation specialist, the court said:

> The rehabilitation lady left a lot, I think, to be desired in terms of how the jury looked at her. Her life care plan in many instances was almost laughable, some of the things she talked about, and I don't think that was lost on the jury and their common sense that they bring to the jury box.

The court noted that the vehicle in which the appellant was riding suffered very little damage and that the appellant did not claim an injury at the scene of the accident and did not seek medical care until some time later. The court also said:

> [S]he earned the most money of her life the first year after the accident, and there were many inconsistencies about her medical and accident history, or as she was— when she was treated and interviewed by the doctors and the defendants' experts, I think she obviously was not open and candid with them when they interviewed her. I don't think that was lost on the jury.

The court concluded:

So I think if you consider the evidence in the light most favorable to the prevailing party, the defendants, and assume that all conflicts in the evidence were resolved by the jury in favor of the defendants, and then assume that, as proved, all facts which the prevailing parties' evidence tends to prove and give to the prevailing party the benefit of all favorable inferences with—which reasonably may be drawn from the facts proved, regrettably for the plaintiff, I think the—there is evidence here from which the jury could reach the verdict they did, and I'll deny the motion for a new trial.

The trial court denied that motion. In denying the motion, the trial court stated:

After hearing argument of counsel and for good cause shown, the Court is of the opinion that when viewing the evidence most strongly in favor of the defendants, there is ample evidence to support the jury's verdict and accordingly the jury's verdict is sustained and the plaintiff's Motion for New Trial is hereby ORDERED DENIED.

In the present proceeding, the appellant claims that the trial court erred in denying her motion for a new trial on the issue of damages where the jury's award of damages was, she claims, inadequate as a matter of law. We disagree. We believe that on consideration of the motion for a new trial the court below identified the sound bases upon which the jury could properly reach its conclusion not to award damages on the evidence adduced.

█ In *Lenox v. McCauley*, 188 W.Va. 203, 423 S.E.2d 606 (1992), this Court indicated that where a damage issue had been tried by a jury, the allegation of inadequate damages should be weighed on appeal by viewing the evidence adduced most strongly in favor of the defendant. The Court also indicated that a jury's award should not ordinarily be set aside unless the award is clearly inadequate. In reaching this conclusion, the Court quoted with approval syllabus point 1 of *Kaiser v. Hensley*, 173 W.Va. 548, 318 S.E.2d 598 (1983), which states:

In an appeal from an allegedly inadequate damage award, the evidence concerning damages is to be viewed most strongly in favor of the defendant.

In the case presently under review, the appellees rather strongly attacked the credibility of the appellant when they showed that the appellant had actually earned very little prior to the accident. Also, as noted by the trial court, they also placed into substantial question the whole issue of her vocational disability due to the accident when they showed that she had not actually quit working after the accident, but had actually earned more than ever before. Their evidence also suggested that any vocational disability was attributable to her work-related knee injury rather than her neck injury. Finally, their medical evidence suggested that the appellant's neck symptomatology was wholly inconsistent with the physical findings made after the auto accident.

During the prior review of this case this Court believed that the evidence as developed suggested that the appellant was entitled to substantial damages. The Court did not, however, conclude that it was so conclusive as to require the entry of a damage award for the appellant. The case was remanded for a new trial on the damage issue and for submission of special interrogatories or a special verdict to the jury.

A retrial by necessity and definition requires that a jury rehear and reconsider the evidence on a factual issue. In the present case that is what occurred, and during the retrial the appellees, as has previously been indicated, substantially impugned the appellant's case. Moreover, it appears that the appellant, for whatever reason, did not adduce evidence of the cost of any treatment indisputably related to the injury of which the appellant complained. Rather, it appears that all of the damages evidence adduced by the appellant was controverted by the appellees to some extent, either as to its relation to this injury or otherwise. After viewing the evidence presented during retrial in the light most favorable to the appellees, as is required by syllabus point 1 of *Kaiser v. Hensley, Id.*, this Court cannot conclude that the jury's award was inadequate.

█ The Court notes that the appellant takes the position that under the holding in *Freshwater v. Booth*, 160 W.Va. 156, 233

S.E.2d 312 (1977), the verdict in this case was patently inadequate. The Court, in the single syllabus of that case, states:

In a tort action for property damage and personal injuries this Court will set aside the jury verdict and award a new trial on all issues where: (1) the jury verdict is clearly inadequate when the evidence on damages is viewed most strongly in favor of defendant; (2) liability is contested and there is evidence to sustain a jury verdict in favor of either plaintiff or defendant; and (3) the jury award, while inadequate, is not so nominal under the evidence as to permit the court to infer that it was a defendant's verdict perversely expressed.

In the present case, as previously indicated, the appellant introduced no evidence of actual doctor or hospital bills, or prescription bills, or any other out-of-pocket expenses or lost wages. If she had introduced such evidence, and if it were reliable, this Court would be compelled to conclude that she was entitled to a new trial on damages under the *Freshwater* rule. However, given the evidence adduced, viewed in the light most favorable to the defendant, we cannot say that the jury was compelled to return a verdict awarding damages to the appellant. Therefore, as noted, we cannot say that the jury's verdict is inadequate. Accordingly, we conclude that *Freshwater* is not controlling in the action before us.

■ The appellant's second claim is that the trial court erred in submitting a verdict form to the jury, over objection, which virtually invited the jury to disregard the proven injuries by providing no line for the jury to award damages for such injuries.

In examining the record in the present case, the Court finds that, in submitting the case to the jury, the trial judge gave an instruction which stated:

The Court instructs the jury that the injuries which the plaintiff sustained as a result of the automobile accident in question are as follows: Cervical sprain and strain, chronic pain resulting therefrom, aggravation of a preexisting depression, torticollis, which is a contraction of the muscles of the neck, and disfigurement. Further, these injuries are presumed to be permanent in nature.

■ Rule 49 of the West Virginia Rules of Civil Procedure governs the submission of special verdict forms to a jury in a civil case. That rule provides, in part:

(a) *Special verdicts.*—The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue.

Federal courts recognize that Federal Rule 49, upon which West Virginia's rule is based, gives a trial judge considerable discretion in submitting special verdict forms. In this Court's view, the criterion for determining whether the discretion is abused is whether the verdict form, together with any instruction relating to it, allows the jury to render a verdict on the issues framed consistent with the law, with the evidence, and with the jury's own convictions. *See* 9A C. Wright & A. Miller, Federal Practice and Procedure: Civil 2d § 2508 (1995); *Martin v. Gulf States Utilities Co.*, 344 F.2d 34 (5th Cir.1965); and *McDonnell v. Timmerman*, 269 F.2d 54 (8th Cir.1959).

It is clear from an examination of the verdict form submitted in the present case that the court instructed the jury that it could find damages for the appellant for future lost wages, future medical and care costs, pain and suffering, and loss of ability to enjoy life. Also, the court clearly instructed the jury that the injuries for which the jury could award damages were cervical sprain and strain, chronic pain resulting therefrom, aggravation of pre-existing depression, torticollis, and disfigurement. The matters covered in the instruction closely corresponded with the matters included in the special verdict form submitted by the appellant, but not given by the court, and it is rather clear that Rule 49 contemplates that

a special verdict be considered in conjunction with a court's instructions to the jury.

The verdict form submitted to the jury, together with the instructions given, covered almost the identical matters contained in the appellant's form and allowed the jury to render a verdict on the issues framed consistent with this Court's remand,. consistent with the evidence, and consistent with the jury's own convictions. Under the circumstances, the Court cannot conclude that the trial judge abused his discretion in submitting the verdict form submitted rather than the verdict form offered by the appellant or that the refusal of the court to submit the appellant's form constituted reversible error.[1]

For the reasons stated, the judgment of the Circuit Court of Fayette County is affirmed.

Affirmed.

---

1. The Court notes that the appellant additionally assigns as error the fact that the appellees' attorney made improper remarks, generally characterized as "golden rule" remarks, during closing argument. The Court has examined the remarks carefully and has concluded that in the overall context of the argument, as well as the trial as a whole, the remarks were not prejudicial. However, such remarks are contrary to law. Trial courts should discourage their use and may consider curative instructions or other curative action upon timely and proper objection.