IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

_____

No. 17-0009

_____

FILED

**April 12, 2018**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

TRI-STATE PETROLEUM CORP., a West Virginia corporation;
EJC LEGACY, INC., a West Virginia corporation;
INTERSTATE SERVICE STATIONS HOLDINGS, INC., a West Virginia corporation;
CONVENIENCE REALTY, LP, a West Virginia limited partnership;
COLLEEN C. MCGLINN, an individual;
EDWARD J. COYNE II, an individual; ERIN C. MERRICK, an individual;
and SHEILA C. ROMANEK, an individual,
Defendants Below, Petitioners

v.

KEVIN P. COYNE,
Plaintiff Below, Respondent

_____

Appeal from the Circuit Court of Ohio County
The Honorable Larry V. Starcher, Judge
Civil Action No. 14-C-200

AFFIRMED, IN PART; REVERSED, IN PART;
AND REMANDED WITH DIRECTIONS

_____

Submitted: February 13, 2018
Filed:  April 12, 2018

Benjamin L. Bailey, Esq.                       W. Howard Klatt, Esq.
Isaac Forman, Esq.                             Klatt Law Offices
J. Zak Ritchie, Esq.                           Wheeling, West Virginia
Bailey & Glasser LLP
Charleston, West Virginia                      Traci S. Rea
Counsel for Petitioners                        Aleksandra V. (Sasha) Williams, Esq.
Convenience Realty LP;                         James C. Martin, Esq.

EJC Legacy, Inc.; and
Tri-State Petroleum Corp.

James J. Sellitti, Esq.
Sellitti, Nogay & McCune
Weirton, West Virginia

Jeffrey P. Ward, Esq.
(admitted pro hac vice)
Cohen & Grigsby, P.C.
Pittsburgh, Pennsylvania
Counsel for Petitioners
Colleen C. McGlinn;
Edward J. Coyne, II;
Eric C. Merrick; and
Sheila C. Romanek

(admitted pro hac vice)
David B. Fawcett, Esq.
(admitted pro hac vice)
Reed Smith LLP
Pittsburgh, Pennsylvania
Counsel for Respondent
Kevin P. Coyne

JUSTICE WALKER delivered the Opinion of the Court.

JUSTICE LOUGHRY dissents, in part, and concurs, in part, and reserves the right to file an opinion dissenting, in part, and concurring, in part.

SYLLABUS BY THE COURT

1.      "The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*."  Syllabus Point 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

2.      "When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party."  Syllabus Point 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

3.      "While the officers and directors of a business corporation are accorded a rather broad latitude in the conduct of the affairs of the corporation, they occupy a fiduciary relationship toward it and its shareholders. The same fiduciary relationship exists on the part of the majority shareholders of a business corporation toward its minority shareholders."  Syllabus Point 2, *Masinter v. WEBCO Co.*, 164 W. Va. 241, 262 S.E.2d 433 (1980).

4. "A violation of the fiduciary relationship may result from oppressive conduct, which is conduct that departs from the standards of good faith and fair dealing which are inherent in the concept of a fiduciary relationship." Syllabus Point 3, *Masinter v. WEBCO Co.*, 164 W. Va. 241, 262 S.E.2d 433 (1980).

5. "An attempt to 'freeze or squeeze out' a minority shareholder from deriving any benefit from his investment in a private business corporation, without any legitimate business purpose, may constitute oppressive conduct." Syllabus Point 4, *Masinter v. WEBCO Co.*, 164 W. Va. 241, 262 S.E.2d 433 (1980).

6. "'The testimony of expert witnesses on an issue is not exclusive, and does not necessarily destroy the force or credibility of other testimony. The jury has a right to weigh the testimony of all witnesses, experts and otherwise; and the same rule applies as to the weight and credibility of such testimony.' Syllabus Point 2, *Webb v. Chesapeake & Ohio Ry Co.*, 105 W. Va. 555, 144 S.E. 100 (1928)." Syllabus Point 2, *Papenhaus v. Combs*, 170 W. Va. 211, 292 S.E.2d 621 (1982).

7. "Although the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syllabus Point 4, *Sanders v. Georgia-Pac. Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976).

8. "As a general rule, a trial court has considerable discretion in determining whether to give special verdicts and interrogatories to a jury unless it is mandated to do so by statute." Syllabus Point 8, *Barefoot v. Sundale Nursing Home*, 193 W. Va. 475, 457 S.E.2d 152 (1995).

9. "Generally, this Court will apply an abuse of discretion standard when reviewing a trial court's decision regarding a verdict form." Syllabus Point 4, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

10. "Ordinarily, attorney's fees in excess of the nominal statutory amounts provided by *W. Va. Code,* 59-2-14 [1960] are not 'costs.'" Syllabus Point 1, *Sally-Mike Prop. v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986).

11. "As a general rule each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement." Syllabus Point 2, *Sally-Mike Prop. v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986).

12. "There is authority in equity to award to the prevailing litigant his or her reasonable attorney's fees as 'costs,' without express statutory authorization, when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons." Syllabus Point 3, *Sally-Mike Prop. v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986).

13. "Where attorney's fees are sought against a third party, the test of what should be considered a reasonable fee is determined not solely by the fee arrangement between the attorney and his client. The reasonableness of attorney's fees is generally based on broader factors such as: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." Syllabus Point 4, *Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 342 S.E.2d 156 (1986).

14. "In reviewing a circuit court's award of prejudgment interest, we usually apply an abuse of discretion standard. When, however, a circuit court's award of prejudgment interest hinges, in part, on an interpretation of our decisional or statutory law, we review *de novo* that portion of the analysis." Syllabus Point 2, *Hensley v. W. Va. Dep't of Health & Human Res.*, 203 W. Va. 456, 508 S.E.2d 616 (1998).

15. "In contract or tort actions, prejudgment interest is available to a litigant as part of compensatory damages if there is an ascertainable pecuniary loss." Syllabus Point 3, *Capper v. Gates*, 193 W. Va. 9, 454 S.E.2d 54 (1994).

16. "'Where, in the trial of an action at law before a jury, the evidence is conflicting, it is the province of the jury to resolve the conflict, and its verdict thereon will not be disturbed unless believed to be plainly wrong.' Syllabus Point 2, *French v. Sinkford,* 132 W. Va. 66, 54 S.E.2d 38 (1948)." Syllabus Point 3, *Pinnacle Min. Co. of N. W. Va. v. Duncan Aircraft Sales of Fla., Inc.*, 182 W. Va. 307, 387 S.E.2d 542 (1989).

WALKER, Justice:

Kevin P. Coyne and his brothers and sisters owned three corporations and one limited partnership—Interstate Service Stations Holdings, Inc. (ISSH); EJC Legacy, Inc. (Legacy), which is the sole stockholder of Tri-State Petroleum Corp. (Tri-State); and Convenience Realty, LP (Convenience Realty). After an extended period of conflict with his siblings—Colleen C. McGlinn; Edward J. Coyne, II; Erin C. Merrick; and Sheila C. Romanek—Kevin's employment with Tri-State was terminated in 2012 and his shares and interest in Legacy, Convenience Realty, and ISSH were redeemed. Kevin sued his four siblings and the four entities (collectively, Petitioners) claiming breach of contract, breach of fiduciary duty, and fraud. After an eleven-day trial in the summer of 2016, a jury awarded Kevin $5,053,111 on his breach of contract and fiduciary duty claims. Later, the circuit court awarded Kevin attorneys' fees in the amount of $1,517,996.40 and prejudgment interest (at the rate of seven percent per year) in the amount of $959,452.46.

On appeal, Petitioners argue that they were entitled to judgment as a matter of law on Kevin's breach of contract and fiduciary duty claims. They also challenge various rulings made during the trial and the award of attorneys' fees and prejudgment interest. We find merit only in the assignments of error regarding attorneys' fees and prejudgment interest. We find that the circuit court abused its discretion in awarding attorneys' fees without making sufficient findings of fact and conclusions of law regarding

1

Kevin's entitlement to the sum awarded, or its reasonableness.[1]  Because Kevin's tort damages were not certain or capable of being rendered certain by reasonable calculation at the time of trial, we also find that the circuit court erred by finding that the entire jury verdict in this case, net of offsets, constituted "special damages" subject to West Virginia Code § 56-3-31 (2012) and awarding Kevin prejudgment interest.

## I.    FACTUAL BACKGROUND

Edward Coyne, Sr., and his wife, Betty, started Tri-State in 1974.  The business distributed petroleum products to customers in West Virginia, Ohio and Pennsylvania.  The Coynes had five children:  Colleen C. McGlinn (Colleen); Edward J. Coyne, II (Ed), Erin C. Merrick (Erin); Sheila C. Romanek (Sheila); and Kevin Coyne (Kevin).  Over time, each of the siblings joined their parents as employees of Tri-State.  Ed and Erin joined in 1984, followed by Kevin and Sheila in 1987.  Colleen earned a law degree in 1983, then moved to Dallas, Texas, to practice law.  In 1997, Colleen joined Tri-State as in-house general counsel, although she continued to live outside the Wheeling, West Virginia–Pittsburgh, Pennsylvania area until approximately 2015.  Ed served as CEO from approximately 1995 to 2005, when he was succeeded by Colleen.

---

[1] *See Aetna Cas. & Sur. Co. v. Pitrolo*, 176 W. Va. 190, 342 S.E.2d 156 (1986).

In the 1990s, Tri-State expanded beyond its initial petroleum distribution business. Tri-State's affiliate at the time, Interstate Petroleum,[2] purchased several BP gas stations in Ohio and West Virginia, pushing the companies' sales to $45 million by 1998. In 2002, Tri-State purchased approximately eighteen Exxon stations in the Pittsburgh area. Prior to the Exxon acquisition, there were hopes that the company could attain annual revenues of $100 million. The Exxon acquisition actually spurred the company to realize annual revenues of more than $200 million.

The 2002 Exxon acquisition represented a leap forward for Tri-State and the Coyne siblings. Over the years, Ed and Betty Coyne ceded control and ownership of the various entities to their children, and by February 1995, each sibling owned an equal one-fifth share of the businesses. Following a corporate restructuring in 2002, each of the siblings was employed by Tri-State, and owned twenty percent of the shares of Legacy, a newly-formed holding corporation that was the sole stockholder of Tri-State. The siblings also held equal limited partnership interests in Convenience Realty, a limited partnership[3] formed in 2002 to hold the family's convenience store properties.

The Coynes adopted various agreements to govern Legacy, Tri-State, and Convenience Realty as those entities and their operations grew more sophisticated and

---

[2] Interstate Petroleum was later merged into Tri-State.

[3] Tri-State was the general partner in Convenience Realty.

3

lucrative. At time relevant to Kevin's breach of contract claim, the stockholders in Legacy—Ed, Colleen, Sheila, Erin, and Kevin—were subject to one such agreement, dated December 1, 2008 (2008 Stockholders Agreement). That agreement provided that, if a stockholder's employment was terminated for "just cause,"[4] then Legacy could redeem the stockholder's entire interest for eighty percent of its "fair market value . . . as determined by the Board of Directors considering, among other factors, the guidelines set forth in Internal Revenue Service Ruling 59-60." The 2008 Stockholders Agreement was signed by Colleen (as a stockholder, and in her capacity as President of Legacy), and Ed, Erin, Kevin, and Sheila as stockholders. Convenience Realty's Limited Partnership Agreement, dated February 1, 2002 (2002 Partnership Agreement), contained a similar provision. As with the 2008 Stockholders Agreement, the 2002 Partnership Agreement was signed by Ed (as a limited partner, and in his then-capacity as President of Tri-State), and Colleen, Erin, Kevin, and Sheila as limited partners.

---

[4] The 2008 Stockholders Agreement defined "just cause" as

> an action of dishonesty (including, but not limited to, criminal conduct) in dealing with the Corporation, a regular and continued breach of an employee's duties to the Corporation after notice and adequate opportunity to cure such breach, or an intentional and regular disregard of the Corporation's reasonable policies, rules or regulations after notice and adequate opportunity to cure such disregard.

*A.* *Kevin's Role in Tri-State and Employment History*

Kevin worked as Tri-State's Vice President of Marketing following his hire in 1987. Early on, Kevin solicited retail gas stations on rural routes to contract with Tri-State. After 2002, Kevin became heavily involved in renovating and rebranding Convenience Realty's new Exxon stations. Kevin held the title of Vice President of Marketing and worked as part of the management team until 2005, when he became Vice President of Real Estate. In March 2006, his title changed to Vice President (dropping the real estate designation) and, in March 2007, he was demoted to Project and Construction Manager.

Kevin worked for Tri-State from approximately 1987 to 1997 without incurring written discipline. However, beginning in 1997—the year that Colleen joined Tri-State as in-house general counsel—disciplinary memos and other documentation of behavioral problems began to fill Kevin's personnel file. Kevin received written discipline in 1998, 1999, 2002, 2003, 2005, and 2006. Kevin was faulted for outbursts, rudeness, throwing a project file and an ink pen at an employee, directing obscene language at a convenience store clerk within earshot of a customer, exceeding his authority, failing to work well with other members of the management team, and allegedly backing Colleen up against a conference room wall when she was four months pregnant.

Tri-State responded to Kevin's infractions at various times by suggesting that he seek mental health counseling, suspending him without pay, and demoting him. In

2002, Tri-State gave Kevin what it called a "final warning," and informed him that if "another violation of the terms of your continued employment . . . occur[ed] . . . we consider this letter formal notice that we have determined that we will be forced to consider termination of your employment." Despite this final warning, and disciplinary memos in 2003, 2005, and 2006, Kevin continued in Tri-State's employ until 2013.

In May 2010, Tri-State insisted that Kevin take a paid sabbatical for up to one year. Erin (acting in her capacity as Tri-State's Director of Corporate Services) explained in a letter to Kevin that the sabbatical was necessary to allow him to address his personal affairs, namely a protracted divorce. The letter stated that the sabbatical was "put in place with both [Kevin] and the Company's best interests in mind," and Tri-State had "nothing but concern and best wishes for [Kevin]." By separate email, Erin assured her brother that the sabbatical would not affect his status as a shareholder. Kevin, however, was not amenable to the proposed sabbatical. In a May 19, 2010 email to his siblings, he stated,

> I am not accepting your proposed leave of absence. . . .
>
> I expect to participate in all activities ans [sic] want my emails answered, not ignored. I want kept informed regarding all negotiations on Martins Ferry and Akron projects. I expect to be informed of all Tri-State Petroleum activities that pertain to me as well!
>
> Why don't you all take a leave of absence!

6

The record demonstrates that in August 2010, Tri-State concluded that it would not permit Kevin to return to work and that his sabbatical would end by December 31, 2010. The record also demonstrates that in that same month, Tri-State was considering terminating Kevin's employment involuntarily so as to trigger the provisions of the 2002 Partnership and 2008 Stockholders Agreements that would enable Legacy and Convenience Realty to buy back Kevin's stocks and partnership interest.

In September 2010, Ed, Colleen, and Erin sent Kevin a letter stating that Tri-State was imposing certain conditions on Kevin's return to full-time employment due to an angry confrontation between Kevin and Ed about employment-related matters at Ed's home earlier that month. Those conditions included undergoing a medical exam to identify and treat any conditions that could have contributed to Kevin's anger in the workplace. The letter concluded by informing Kevin that his sabbatical would continue until May 11, 2011, so long as he provided Tri-State's board of directors with evidence that he was actively taking steps to meet these newly-imposed conditions.

Despite the representation that the sabbatical would end in May 2011, it actually continued until July 2012.[5] At that time, Tri-State's board of directors (Colleen, Ed, and Erin) determined that Kevin's employment would end based on events that had

---

[5] Tri-State's board of directors (Colleen, Ed, and Erin) represented that they chose to extend Kevin's sabbatical due to personal and family matters.

occurred while he was on sabbatical. A consent in lieu of special meeting adopted by the board described those events in some detail:

> (i) Kevin's continued refusal to comply with the conditions to return to full-time employment, (ii) his own acknowledgments that he lacked interest in returning to work, (iii) Kevin's acknowledgment's [sic] to senior management that he is incapable of working with other members of the management team, (iv) in the entire time Kevin has been on paid leave, he has never once requested to return to full-time employment, (v) Kevin has been actively involved in several other business activities and ventures since May 2010, and (vi) the fact that adequate time and allowances have been made for Kevin to have been able to satisfy the terms and conditions of the September 29, 2010 letter and return to work, and no effort whatsoever has been made by Kevin to return to work.

This document lacked any reference to Kevin's pre-2010 disciplinary memos or a statement that Tri-State's board of directors was terminating his employment for "just cause," so as to trigger the redemption options found in the 2008 Stockholders and 2002 Partnership Agreements.

On September 12, 2012, Legacy's board of directors (Ed, Colleen, and Erin), and all of Legacy's shareholders (Ed, Colleen, Erin, and Sheila), excluding Kevin, endorsed another consent in lieu of special meeting. That document included the following representations: (1) on July 11, 2012, Tri-State had terminated Kevin's employment "for cause"; (2) dating back to at least 2002, Kevin had a documented history of behavioral problems at work that "could have potentially put the company at risk for other potential

liability"; and (3) Kevin had recently physically attacked another Legacy shareholder.[6] For those reasons, the board and the Legacy shareholders (excluding Kevin) concluded that it was in the best interest of the business to exercise their rights under the 2008 Stockholders Agreement to redeem Kevin's shares in Legacy.

Legacy then retained a valuation firm, Gleason & Associates P.C. (Gleason P.C.), to determine the fair market value of Kevin's stock and partnership interests as of June 30, 2012, the effective date of Kevin's termination of employment. Gleason P.C. valued the entire business at approximately $22,660,000 and the fair market value of Kevin's interest at $2,249,000 ($1,600,000 in Legacy; $535,000 in Convenience Realty, and $114,000 in ISSH). On June 20, 2013, Kevin received approximately $1.7 million for his interests (the fair market value according to Gleason P.C., minus a twenty percent discount to be applied under the terms of the 2002 Partnership and 2008 Stockholders Agreement in the case of a just cause termination) by way of payments totaling $360,236 and promissory notes totaling $1,349,400.

## B.    *The Bridgeville and Oakland Properties*

As part of the larger 2002 Exxon deal, Convenience Realty acquired two Exxon gas stations in Bridgeville, Pennsylvania (the Bridgeville property), and on Forbes

---

[6] Based on a contemporaneous email drafted by Erin, on Sunday, September 2, 2012, Erin, her husband, and Kevin were involved in a heated argument at Kevin's house that included a threat of physical violence by Kevin. Despite that threat, no physical attack appears to have occurred.

Avenue in Pittsburgh's Oakland neighborhood (the Oakland property). Prior to the termination of Kevin's employment with Tri-State and the redemption of his shares and partnership interest, Kevin put together materials and binders outlining development ideas for various properties owned by Convenience Realty, including those in Bridgeville and Oakland.

For Bridgeville, Kevin proposed a grocery-anchored shopping center. Kevin also identified adjacent property then owned by GE Ionics as a purchase necessary to realize the development goal for the Bridgeville property. As to Oakland, Ed testified that Kevin "bounced around a lot of ideas to me. He talked about a hotel. He had talked about a parking garage. He had talked about, you know, [the University of Pittsburgh] putting another building there. He had said [we] needed to acquire another piece of property where a Chinese restaurant was."

### 1.    *The Bridgeville Property*

Ed, Colleen, Erin, and Sheila took steps to develop Convenience Realty's Bridgeville property during Kevin's paid sabbatical (May 2010 – July 2012), but did not inform Kevin of their actions. They formed Bridgeville Realty, LP (BRLP) in November 2011.[7] In December 2011, Tri-State gave BRLP a $300,000 line of credit. Also in

---

[7] Colleen, Ed, Erin, and Sheila are limited partners in Bridgeville Realty, LP. Bridgeville Realty Associates, LLC, (owned by Colleen, Ed, Erin, and Sheila) is the general partner.

December 2011, BRLP entered into an agreement with GE Ionics to purchase the 6.8 acres adjacent to the Bridgeville property—the parcel previously identified by Kevin as necessary to develop the Bridgeville property.

In June 2012, ISSH[8] made one $7,500 distribution each to Ed, Colleen, Sheila, and Erin. Ed, Colleen, Sheila, and Erin each wrote a $7,500 check to BRLP ($30,000 total), which then paid $25,000 to Chicago Title Insurance to obtain an extension of a development-related deadline at the Bridgeville property. Kevin did not receive a $7,500 distribution from ISSH, although he was an equal shareholder to Ed, Colleen, Erin, and Sheila (and was still employed by Tri-State) in June 2012.

By September 2012, BRLP was not only under contract to purchase the GE Ionics property adjacent to Convenience Realty's Bridgeville property, it had also engaged an engineering firm to prepare an initial site plan for the property and received a formal letter of intent from the project's anchor tenant, grocery chain Aldi. The following September, approximately three months after Kevin's interest in Convenience Realty was redeemed, Convenience Realty transferred the Bridgeville property to Colleen, Ed, Erin, and Sheila, individually. They, in turn, transferred the property to BRLP as a capital

[8] ISSH operates a combined gas station, convenience store, and Wendy's restaurant in Zanesville, Ohio.

contribution. As of the 2016 trial, BRLP had completed development of the Bridgeville property. Grocery chain Aldi anchors the development.

### 2. The Oakland Property

As Colleen acknowledged at trial, the Oakland property—a gas station—is in a good location on a major thoroughfare near the University of Pittsburgh campus. In July 2012, Ed, Colleen, Sheila, and Erin created Comhdan Realty, LP (CRLP). That same month, CRLP contracted to purchase the Chinese restaurant adjacent to the Oakland property—the parcel identified by Kevin as necessary to the development of the Oakland property.[9] In August 2013, Convenience Realty transferred the Oakland property to Colleen, Ed, Erin, and Sheila, individually. They, in turn, transferred the property to CRLP as a capital contribution. The transfer of the Oakland property from Convenience Realty to CRLP had been contemplated as early as June 2012, the month before Tri-State terminated Kevin's employment.

## II. Procedural History

Kevin filed a civil complaint in the Circuit Court of Ohio County in July 2014 bringing claims against his siblings and the four corporate entities for breach of contract and fiduciary duty. In August 2015, Kevin filed an amended complaint in which he asserted a fraud claim against Colleen, individually; a claim of usurpation of corporate

---

[9] CRLP closed on the purchase of the restaurant property in September 2013.

opportunities under West Virginia Code § 31D-14-1430 (2002); conversion and breach of fiduciary duty against his siblings; and breach of contract against his siblings and corporate defendants. The circuit court then dismissed the § 31D-14-1430 and conversion claims because, it reasoned, Kevin lacked standing to pursue those derivative claims because he was no longer a Legacy shareholder.

In May 2016, the circuit court granted Kevin leave to file a second amended complaint, which, of relevance here, included claims for breach of contract against Petitioners; breach of fiduciary duty against Colleen, Ed, Erin, and Sheila; and fraud against Colleen. The breach of fiduciary duty claim in the second amended complaint included factual allegations regarding the Bridgeville and Oakland properties that had previously been part of Kevin's § 31D-14-1430 and conversion claims. The parties then filed cross-motions for summary judgment, which the circuit court denied in June 2016 "because if there is a case that there is [sic] questions of fact, it's certainly this case." Trial commenced on June 21, 2016, and concluded on July 7, 2016, with the jury returning a verdict of $5,053,111 for Kevin on both his breach of contract and fiduciary duty claims. Neither Kevin nor Petitioners objected to the dual form of this award or asked the circuit court to inquire further of the jury as to the allocation of this verdict between those causes of action. The jury found for Colleen on Kevin's fraud claim.

Petitioners then timely moved for judgment as a matter of law under Rule 50(b) of the West Virginia Rules of Civil Procedure on Kevin's breach of contract and

fiduciary duty claims, and, alternatively, for a new trial. On December 7, 2016, the circuit court entered an order denying that motion, granting Kevin attorneys' fees in the amount of $1,517,996.40,[10] and directing the clerk to enter a final judgment order. The circuit court also ordered that seven percent prejudgment interest be imposed on the net jury verdict ($3,233,911[11]) from September 12, 2012—the date Legacy notified Kevin that it was redeeming his shares. It is from this order that Petitioners now appeal.

## II.    STANDARD OF REVIEW

Petitioners' various assignments of error call for different standards of review. We state the particular standard of review applicable to each assignment of error in the corresponding portion of the opinion, below.

## III.    DISCUSSION

Petitioners raise seven assignments of error on appeal. We address them in the following order, as described by the substance of each assignment of error: (1) Kevin's breach of fiduciary duty claim; (2) Kevin's breach of contract claim; (3) evidence admitted in support of Kevin's fraud claim against Colleen; (4) the 2010 releases; (5) the circuit

---

[10] The circuit court also granted Kevin $18,158.08 in costs under West Virginia Rule of Civil Procedure 54(d). Petitioners do not challenge this award on appeal.

[11] The circuit court granted Petitioners' motion to mold the $5,053,111 verdict to reflect the June 20, 2013 payments by Legacy to Kevin toward the redemption of his shares and partnership interest.

14

court's verdict form; (6) the award of attorney's fees; and (7) the award of prejudgment interest.

## A.    Breach of Fiduciary Duty

At trial, the jury found in Kevin's favor on his breach of fiduciary duty claim against Colleen, Ed, Erin, and Sheila.  Petitioners argued at summary judgment, and then again in their post-trial motion for judgment as a matter of law under Rule 50(b), that Kevin was barred from pursuing this claim for two reasons.  First, Petitioners argued that Kevin's breach of fiduciary duty claim was a really a claim for breach of the 2002 Partnership and 2008 Stockholders Agreements, and that this Court's reasoning in *Gaddy Engineering Co. v. Bowles Rice McDavid Graff & Love*, *LLP*[12] barred Kevin's tort claim as a matter of law. Second, Petitioners argued that the circuit court's dismissal of the § 31D-14-1430 (usurpation of corporate opportunity) and conversion claims from the amended complaint barred Kevin from including allegations related to the Bridgeville and Oakland properties to the breach of fiduciary duty claim in his second amended complaint.

Kevin responds that settled West Virginia law authorizes direct breach of fiduciary claims such as his in the context of close corporations, and that the dismissal of the usurpation of corporate opportunity and conversion claims from the amended complaint does not prevent him from including allegations regarding the Bridgeville and Oakland

---

[12] 231 W. Va. 577, 746 S.E.2d 568 (2013).

15

properties in his second amended complaint in support of his breach of fiduciary duty claim.

This Court reviews a circuit court's denial of a Rule 50(b) motion *de novo*. Where issues of fact are concerned, however, we must view the evidence offered at trial in the light most favorable to the nonmoving party.

> The appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo.*

> When this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.[13]

We now analyze Petitioners' arguments in view of that standard.

Legacy—a holding company and sole shareholder of Tri-State, Kevin's former employer—is a close corporation. "A 'close corporation' has been defined as a corporation with a small number of shareholders whose shares are not generally traded in

---

[13] Syl. Pts. 1 and 2, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).

the securities market."[14]  The parties do not dispute that when Kevin's employment was terminated in 2012, and his shares in Legacy were redeemed the following year, he owned approximately seventeen percent of that corporation and Convenience Realty.  He owned twenty percent of ISSH.  His siblings, Ed, Colleen, Sheila, and Erin, owned equal portions of the remainder of the corporations and partnership.  Thus, Kevin occupied a minority position in the family businesses relative to his siblings prior to the redemption of his shares and partnership interest in 2013.

This Court previously considered the majority-minority shareholder relationship in *Masinter v. WEBCO Company*.[15]  In that case, Masinter, Cohen, and Webb owned equal shares of WEBCO Company.[16]  Over a number of years, the three men fell out.  Cohen and Webb then removed Masinter from the corporate board, which terminated his corporate salary.[17]  The pair also excluded Masinter from direct participation in WEBCO's operations.[18]  Later, WEBCO, which was based in Huntington, opened a store in Charleston.  Masinter believed that WEBCO's new store was intended to hurt his own

---

[14] *Masinter v. WEBCO Co.*, 164 W. Va. 241, 242 n.1, 262 S.E.2d 433, 435 n.1 (1980).

[15] *Id.*, 164 W. Va. at 241, 262 S.E.2d at 433.

[16] *Id.* at 244, 262 S.E.2d at 436.

[17] *Id.* at 245, 262 S.E.2d at 437.

[18] *Id.*

retail business in Charleston, so he filed suit seeking dissolution of WEBCO and damages from Webb and Cohen individually due to their allegedly oppressive conduct.[19]

On review, this Court found that Masinter's relief was not limited to dissolution of WEBCO, and so reversed the circuit court's order granting summary judgment to Webb and Cohen. We held that Masinter could seek damages from Webb and Cohen individually for breaching their fiduciary duties—duties they owed to Masinter by virtue of their position as majority shareholders. We explained:

> While the officers and directors of a business corporation are accorded a rather broad latitude in the conduct of the affairs of the corporation, they occupy a fiduciary relationship toward it and its shareholders. The same fiduciary relationship exists on the part of the majority shareholders of a business corporation toward its minority shareholders.[20]

We also explained the following with regard to the duties owed by officers and directors to the corporation and its shareholders, and therefore also owed by majority shareholders to minority shareholders:

> Directors are not technically trustees, but are agents who bear a relation of trust and confidence to their principal. They stand in a fiduciary relation to the corporation and are held to the utmost good faith in their dealings with it. They must manage its business with a view to promote the common interests, and cannot directly or indirectly derive personal

---

[19] *Id*. at 245–47, 262 S.E.2d at 437–38.

[20] *Id*., Syl. Pt. 2, at 241, 262 S.E.2d at 433.

profit or advantage from their position which is not shared by all the stockholders. . . .[21]

We also explained in *Masinter* the broad types of majority shareholder conduct that may constitute a breach of the fiduciary duties owed by the majority to the minority:

> A violation of the fiduciary relationship may result from oppressive conduct, which is conduct that departs from the standards of good faith and fair dealing which are inherent in the concept of a fiduciary relationship.

> An attempt to "freeze or squeeze out" a minority shareholder from deriving any benefit from his investment in a private business corporation, without any legitimate business purpose, may constitute oppressive conduct.[22]

Thus, in Syllabus Points 2, 3, and 4 of *Masinter*, this Court recognized that, in the context of a close corporation, a minority shareholder may have a direct cause of action for breach of fiduciary duty against a majority shareholder(s) based upon the majority's oppressive conduct. We are not unique in taking this position: "Most states have adopted the view that a dissolution statute does not provide the exclusive remedy for injured shareholders and that the courts have equitable powers to fashion appropriate remedies where the majority shareholders have breached their fiduciary duty to the

---

[21] *Id*. at 251–52 n.9, 262 S.E.2d at 440 n.9 (internal citations and quotations omitted).

[22] *Id.*, Syl. Pts. 3 and 4, at 241, 262 S.E.2d at 433.

19

minority by engaging in oppressive conduct."[23]  Similarly, a regularly cited treatise provides that: "Fiduciary duties increasingly can be enforced as direct suits brought by individual shareholders, particularly in closely held firms. Judicial authority exists in half of the states authorizing such direct suits and is sometimes provided by statute; the number of states with such authority have been growing for several decades."[24]

Nevertheless, Petitioners draw upon the 2002 Partnership and 2008 Stockholders Agreements to argue that Kevin's breach of fiduciary duty claim is an impermissible rehash of his claim against Petitioners for breaching those agreements, and is barred by the gist of the action doctrine.  This Court last examined the gist of the action doctrine in *Gaddy Engineering*, which involved a joint venture between a law firm and engineering company.[25]  The engineering company alleged that it had formed a fee-sharing agreement with the law firm, which, it claimed, the law firm had breached.[26]  The engineering company also asserted a fraud claim, alleging that the law firm misrepresented to the engineering firm that it would share its legal fees.[27]

---

[23] *Id*. at 250, 262 S.E.2d at 439–40.

[24] 2 F. Hodge O'Neal & Robert B. Thompson, *Close Corporation and LLCs: Law and Practice* § 9:26 (Rev. 3d ed. July 2017 update) (hereinafter, *O'Neal & Thompson*).

[25] *Gaddy Eng'g*, 231 W. Va. at 581, 746 S.E.2d at 572.

[26] *Id*. at 580–82, 746 S.E.2d at 571–73.

[27] *Id*. at 585, 746 S.E.2d at 576.

20

This Court found that the gist of the engineering company's action against the law firm was the breach of their alleged fee agreement, and not fraud, and that the engineering company's tort claim was therefore barred. We explained that:

> Under this [gist of the action] doctrine, recovery in tort will be barred when any of the following factors is demonstrated:
>
> > (1) where liability arises solely from the contractual relationship between the parties; (2) when the alleged duties breached were grounded in the contract itself; (3) where any liability stems from the contract; and (4) when the tort claim essentially duplicates the breach of contract claim or where the success of the tort claim is dependent on the success of the breach of contract claim.[28]

In sum, "whether a tort claim can coexist with a contract claim is determined by examining whether the parties' obligations are defined by the terms of the contract."[29]

That summation leads one to the reason why Petitioners' gist of the action argument must fail on the facts presented by this case. Here, the parties' obligations are shaped not only by the terms of the 2002 Partnership and 2008 Stockholders Agreements, but also by the majority's overarching fiduciary duty articulated in *Masinter*. That duty exists independently of the 2002 Partnership and 2008 Stockholders Agreements. In other words, even if those agreements did not exist, Kevin's siblings—the majority shareholders

---

[28] *Id.* at 577, 746 S.E.2d at 586 (citing *Star v. Rosenthal*, 884 F.Supp.2d 319, 328–29 (E.D. Pa. 2012)).

[29] *Id.* (citing *Goldstein v. Elk Lighting, Inc.,* Civil No. 3:12-168, 2013 WL 790765 at *3 (M.D. Pa. 2013)).

in Legacy—would still owe a fiduciary duty to him, the minority shareholder. Thus, the "standards of good faith and fair dealing which are inherent"[30] in that relationship do not stem solely from the 2002 Partnership and 2008 Stockholders Agreements, but from the larger social policy embodied in *Masinter*: "the policy requiring fair dealing and solicitude from a majority shareholder to minority shareholders in a joint venture."[31] The circumstances in this case contrast with those presented in *Gaddy Engineering*, where no established fiduciary relationship, or "larger social policies,"[32] supported the engineering company's tort claim.

This is not to say that, in every case, a plaintiff may successfully plead both breach of contract and fiduciary duty claims. If, for example, a complaint presents all of

---

[30] Syl. Pt. 3, in part, *Masinter*, 164 W. Va. at 241, 262 S.E.2d at 433.

[31] *Bohler-Uddeholm Am., Inc. v. Ellwood Grp.*, 247 F.3d 79, 105 (3d Cir. 2001); *see also Batoff v. Charbonneau*, Civil No. 12-05397, 2013 WL 1124497, at *7 (E.D. Pa. Mar. 19, 2013) (dismissing a breach of fiduciary duty claim under gist of the action doctrine because "the only duties plaintiff had to defendants arose from the contract between the parties"); *Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 621 (E.D. Pa. 2010) (dismissing a breach of fiduciary duty claim under gist of the action doctrine where plaintiffs "put forth no allegations of breach of fiduciary duty or duty of loyalty that transcend or exist outside Cola's and Tola's obligations under the Employment Agreements"); *Ginley v. E.B. Mahoney Builders, Inc., Edwin B. Mahoney*, Civil No. 04-1986, 2005 WL 27534, at *2 (E.D. Pa. Jan. 5, 2005) ("[A] breach of fiduciary duty claim will survive the gist of the action doctrine only where the fiduciary relationship in question is well-established and clearly defined by Pennsylvania law or policy, such as (for example) the social policy which defines relationships among majority and minority shareholders."); *Gaddy Eng'g*, 231 W. Va. at 586, 746 S.E.2d at 577.

[32] *Gaddy Eng'g*, 231 W. Va. at 586, 746 S.E.2d at 577 (citing G*oldstein,* 2013 WL 790765 at *3).

22

the alleged breaches of the parties' contract also as breaches of fiduciary duties, then the gist of the action doctrine may bar the plaintiff's tort claim.[33] Looking to Kevin's second amended complaint, however, we see that is not the case, here. Specifically, Kevin alleged that Colleen, Ed, Erin, and Sheila breached their fiduciary duties by siphoning off the Bridgeville and Oakland properties from Convenience Realty for their own benefit, to separate companies in which Kevin was not a member or partner. Kevin further alleges that his siblings violated their fiduciary duties by failing to inform him of the steps they were taking to develop these opportunities independently. Those alleged violations of the majority shareholders' fiduciary duties to Kevin, the minority shareholder, do not arise from obligations imposed in either the 2002 Partnership Agreement or 2008 Stockholders Agreement, and so do not duplicate Kevin's breach of contract claim. For those reasons, we conclude that, on the facts of this case, the gist of the action doctrine does not bar Kevin's breach of fiduciary claim against Collen, Ed, Erin, and Sheila.

We now turn to Petitioners' second argument regarding shareholder standing. The circuit court dismissed Kevin's § 31D-14-1430 (usurpation of corporate opportunity) and conversion claims from his amended complaint because those claims, which the circuit court concluded belonged to the corporation, could only be brought derivatively by a current shareholder. The circuit court concluded that Kevin, as a former

---

[33] *Id.* at 586, 746 S.E.2d at 577 (gist of the action doctrine bars recovery if tort essentially duplicates the breach of contract claim).

23

shareholder, lacked standing to pursue those claims on the corporation's behalf.  Petitioners argue that the circuit court's reasoning should be extended and bar Kevin from including factual allegations formerly associated with the § 31D-14-1430 and conversion claims in support of the claim of breach of fiduciary duty in his second amended complaint.

From a procedural perspective, Petitioners have not offered any authority to support the conclusion that a plaintiff may use a factual allegation to support only one theory of liability.  And, from a substantive perspective, we do not find that the circuit court committed error.  This Court recognized in *Masinter* that a minority shareholder may pursue a breach of fiduciary duty claim against majority shareholders directly, that the minority shareholder was not confined to a derivative suit, and that, "[i]n a given case, it is possible that both causes of action may be utilized."[34]

Additionally, as this case involves allegations of oppressive conduct by four shareholders (Colleen, Ed, Erin, and Sheila) acting against one (Kevin), we agree with the observation of the Supreme Court of Ohio, which has stated:

> [I]f we require a minority shareholder in a close corporation, who alleges that the majority shareholders breached their fiduciary duty to him, to institute [a derivative action], then any recovery would accrue to the corporation and remain under the control of the very parties who are defendants in the litigation. Thus, a derivative remedy is not an effective remedy because

---

[34] *Masinter*, 164 W. Va. at 255, 262 S.E.2d at 442.

24

the wrongdoers would be the principal beneficiaries of the recovery.[35]

A regularly cited treatise has similarly commented that the "derivative/direct distinction makes little sense when the only interested parties are two individuals or sets of shareholders, one who is in control and the other who is not."[36] For that reason, as well as those discussed immediately above, we find Petitioners' arguments in support of their Rule 50(b) motion unpersuasive.

## B.    *Kevin's Breach of Contract Claim*

Kevin also alleged in his second amended complaint that Petitioners breached the terms of the 2002 Partnership and the 2008 Stockholders Agreements by terminating his employment without just cause and by failing to offer him fair value for his shares and partnership interest. Following trial, the jury found in Kevin's favor on his breach of contract claim. Petitioners then moved the circuit court to enter judgment in their favor on that claim, notwithstanding the jury verdict, under Rule 50(b).

---

[35] *Crosby v. Beam*, 548 N.E.2d 217, 221 (Oh. 1989); *see also see also Dowling v. Narragansett Cap. Corp.*, 735 F. Supp. 1105, 1113–14 (D.R.I. 1990) (minority shareholder could bring direct action; to require him to bring suit on behalf of corporation would benefit controlling shareholders, which is "an absurd result").

[36] 2 *O'Neal & Thompson* § 9:26, *supra* note 24; *see also Dowling v. Narragansett Capital Corp.*, 735 F. Supp. 1105, 1113–14 (D.R.I. 1990) (minority shareholder could bring direct action; to require him to bring suit on behalf of corporation would benefit controlling shareholders, which is "an absurd result").

In support of their motion, Petitioners argued that: (1) Kevin waived his right to challenge the redemption of his stock and partnership interests because he accepted preliminary payment from Petitioners of amounts owed to him under the 2002 Partnership and the 2008 Stockholders Agreements; (2) Kevin failed to offer any relevant evidence regarding the redemption price imposed by the Petitioners, so he cannot challenge it; and (3) Colleen, Ed, Erin, and Sheila cannot be held liable individually for breaches of the 2002 Partnership and the 2008 Stockholders Agreements. The circuit court denied Petitioners' Rule 50(b) motion, and they now raise those same arguments to this Court on appeal.[37] We analyze each of these arguments in turn, under the standard of review applicable to Rule 50(b) motions.[38]

---

[37] Before this Court, Petitioners also argue that an "irrefutable mountain of evidence" supported Kevin's termination for just cause. Petitioners, however, did not raise this argument before the circuit court in their Rule 50(b) motion. "Our general rule in this regard is that, when nonjurisdictional questions have not been decided at the trial court level and are then first raised before this Court, they will not be considered on appeal." *Whitlow v. Bd. of Educ. of Kanawha Cty.*, 190 W. Va. 223, 226, 438 S.E.2d 15, 18 (1993). Moreover, "a party who fails to present a Rule 50(a) motion on an issue at the close of evidence waives the right to present a Rule 50(b) motion after judgment and the right to challenge the sufficiency of the evidence on appeal." L.J. Palmer & R.J. Davis, *Litigation Handbook on West Virginia Rules of Civil Procedure* 1190–91 (5th ed. 2017) (citing *Osoria v. One World Tech., Inc.*, 659 F.3d 81 (1st Cir. 2011) ("A challenge to the sufficiency of the evidence . . . on appeal must first be raised at the close of all evidence at trial. If . . . the district court denies the litigant's motion for judgment as a matter of law and the case is submitted to the jury, the movant must renew the motion once again in order to preserve the issue for appeal."). Because Petitioners did not raise this issue below, it is not properly preserved for this Court's review.

[38] *See* Syl. Pts. 1 and 2, *Fredeking*, 224 W. Va. at 1, 680 S.E.2d at 16.

*1.      Ratification*

On June 20, 2013, Kevin received approximately $1.7 million for his stock and partnership interests by way of payments totaling $360,236 and promissory notes totaling $1,349,400.  As Petitioners observe, payments on the notes have been consistently made and Kevin cashed all checks issued to him.  Petitioners argue that, by doing so, Kevin ratified the 2002 Partnership and the 2008 Stockholders Agreements, thereby preventing him, as a matter of law, from challenging his termination and the redemption of his interests, and precluding him from arguing that the redemption value assigned to those interests was inadequate.

In support of this ratification argument, Petitioners point to *Hamilton v. McCall Drilling Co.*, in which we stated that, "[r]atification, in sense of affirmation of contract and waiver of defense to it, is a matter of intention. . . .  One who has accepted benefits under a contract, or exercised dominion over property acquired thereunder after knowledge of facts warranting rescission, ratifies the agreement."[39]  As that statement makes clear, ratification of a contract is a matter of intent.

The record contains more than enough evidence to lead a reasonable trier of fact to conclude that Kevin lacked the necessary intent to ratify the 2002 Partnership and the 2008 Stockholders Agreements when he accepted the payment ($360,236) and

---

[39] 131 W. Va. 750, 754, 50 S.E.2d 482, 484–85 (1948).

27

promissory notes ($1,349,400) for his stock and partnership interests. On March 26, 2013, Petitioners' counsel sent Kevin's counsel a letter stating, "We agree that Mr. Coyne can negotiate the checks he has received as advances on the purchase price without relinquishing any claims he may possess against Tri-State or any affiliated entity." This letter clearly states that Kevin could negotiate payment without relinquishing his claims.

The foreign authority offered by Petitioners is unpersuasive, as well. Petitioners represent that the Nebraska Supreme Court has applied a rule similar to our dicta in *Hamilton* in the context of a close corporation to estop the minority-shareholder plaintiff from contesting the validity of a stock sale agreement where the seller had accepted payments totaling $180,000. In that case, *Baye v. Airlite Plastics Co.,*[40] a personal representative of an estate claimed that a shareholder agreement was invalid, but then proceeded to accept payments provided under that agreement for a number of years. The Nebraska court concluded that because the personal representative accepted the benefit of the agreement, he was estopped from challenging its validity because it would be unconscionable to permit a person to maintain a position inconsistent with one in which he has acquiesced or of which he has accepted any benefit.[41]

---

[40] 618 N.W.2d 145, 149 (Neb. 2000).

[41] *Id.*, 618 N.W.2d at 150–51.

28

Kevin did not seek to invalidate the 2002 Partnership Agreement or the 2008 Stockholder Agreement, as the plaintiff did in *Baye*. Rather, he sought to enforce those agreements according to what he contended their terms required. Thus, *Baye* does not speak to the facts of this case and does not weigh in favor of Petitioners' ratification argument. *Sharp v. Valley Forge Life Ins. Co.,*[42] also cited by Petitioners, is likewise inapposite. That case addressed the question of whether an insurer was estopped from cancelling a plaintiff's policy for non-payment because the insurer had inadvertently cashed the plaintiff's tardy premium payment. Thus, as in *Baye*, the issue in *Sharp* was whether a party had waived its right to argue that the parties' contract was void, not whether the party had waived his or her right to enforce the contract's terms.

Moreover, the parties do not dispute that Kevin was entitled to at least $1.7 million for his partnership and stock interests, which is the approximate amount of the check and promissory note. Thus, in light of Petitioners' counsel's 2013 letter, Kevin's acceptance of that undisputed sum does not evidence an intent to waive a claim to contract damages exceeding that figure. In short, the circuit court did not err in denying Petitioners' Rule 50(b) motion for a judgment as a matter of law with regard to Petitioners' ratification argument.

---

[42] 490 F. Supp. 2d 909, 917 (E.D. Tenn. 2007).

## 2. *Redemption Price*

Petitioners next argue that they were entitled to judgment as a matter of law on Kevin's breach of contract claim because Kevin's valuation expert opined regarding the "fair value," and not the "fair market value," of Kevin's shares and interests upon redemption. Petitioners contend that the 2002 Partnership and the 2008 Stockholder Agreements set the applicable redemption price at eighty percent of "fair market value" of the shares and partnership interest. Because Kevin's expert opined as to the "fair value," not "fair market value," they argue, Kevin did not offer evidence of his contract damages, and a reasonable trier of fact could have not have found in his favor on his breach of contract claim.

Again, reviewing the evidence offered at trial in the light most favorable to Kevin, the prevailing party, we find that the circuit court did not err in denying Petitioners' Rule 50(b) motion on this point. According to the expert testimony heard by the jury during trial, the salient difference between the "fair market value," offered by Petitioners' expert, and "fair value," offered by Kevin's expert, is discounts. Petitioners' valuation expert, Mark Gleason, opined that the "fair market value" of a stockholder's interest in a close corporation is not his proportional interest in the business. Rather, "fair market value" is the value of the stockholder's proportional interest subject to discounts for lack of control and lack of marketability. On the other hand, Kevin's valuation expert, Daniel Selby, opined that those discounts should not be applied on the facts of this case because deposition testimony demonstrated that the siblings did not intend to sell their interests for

30

at least ten years, so "if nobody else is going to suffer those—those discounts at any point in time, then you wouldn't have [Kevin] suffer those discounts."

This is a classic "battle of the experts," and we decline Petitioners' invitation to substitute our own determination as to these experts' credibility and persuasiveness for the jury's. Petitioners' counsel cross-examined Selby extensively regarding the applicability of the marketability and control discounts to Kevin's interests. The jury heard and saw both Gleason and Selby, and it was uniquely situated to assess their conflicting opinions. As we have previously stated:

> The testimony of expert witnesses on an issue is not exclusive, and does not necessarily destroy the force or credibility of other testimony. The jury has a right to weigh the testimony of all witnesses, experts and otherwise; and the same rule applies as to the weight and credibility of such testimony.[43]

For that reason, we find that the circuit court did not err in denying Petitioners' Rule 50(b) motion on this point.

### 3. *Individual Liability on the 2002 Partnership and the 2008 Stockholders Agreements*

Petitioners also argue that the circuit court erred by not granting the individual defendants judgment as a matter of law under Rule 50(b) on Kevin's breach of contract claim. They argue that each of the alleged breaches of the 2002 Partnership and

---

[43] Syl. Pt. 2, *Papenhaus v. Combs*, 170 W. Va. 211, 292 S.E.2d 621 (1982) (quoting Syl. Pt. 2, *Webb v. Chesapeake & Ohio Ry. Co.*, 105 W. Va. 555, 144 S.E. 100 (1928)).

31

the 2008 Stockholder Agreements involved matters purely reserved to Tri-State or Legacy's board of directors, or to the general partner in Convenience Realty, that is, Tri-State. Citing *Laya v. Erin Homes, Inc.,*[44] they argue that the individual defendants, who are all shareholders or limited partners in those entities, cannot be held liable for the corporations' or partnership's breach of contract. Kevin responds that the individual defendants signed those agreements in their individual capacities, and, therefore, may be held personally liable for their breach.

Based on our review of the 2002 Partnership and the 2008 Stockholder Agreements, we do not agree with Petitioners' contention. The siblings executed these agreements as individual limited partners and stockholders. There is no designation in either the 2002 Partnership or the 2008 Stockholder Agreements (for example, such as, "in her capacity as director of the corporation") that could lead one to conclude otherwise. The fact that both documents include exactly that type of designation for Ed (when signing as President of Tri-State) and Colleen (when signing as President of Legacy, the general partner in Convenience Realty) only underscores the individual nature of the other signatures to the agreements.

---

[44] 177 W. Va. 343, 352 S.E.2d 93 (1986).

In *Laya*, we restated the fundamental proposition that a corporate "shareholder is normally not liable individually to a creditor of the corporation."[45] The contract at issue in *Laya* was one between a corporation and a third party for the sale and delivery of a mobile home.[46] The agreements at issue in this case do not obligate Legacy or Convenience Realty to third parties. Rather, the 2002 Partnership and the 2008 Stockholder Agreements are agreements among the stockholders and partners relating to the management and ownership of the corporation (Legacy) and partnership (Convenience Realty). For example, the 2008 Stockholders Agreement provides for the "continuity of management and ownership of the Corporation" and so "restrict[s] the transfer of shares of Stock among the present Stockholders to the exclusion of other parties." Thus, the obligation imposed by the 2002 Partnership and the 2008 Stockholder Agreements is different from that imposed by the sales contract in *Laya*.

A Delaware court rejected an argument identical to that which Petitioners now raise. The case of *Silverstein v. David J. Stone & Co, Inc.*[47] arose from the termination of the business association between the individual plaintiffs, referred to generally by the Delaware court as the Phoenix Group, and David and Sara Stone (the Stones). The Phoenix Group and the Stones each owned fifty percent of the stock of two corporations, David J.

---

[45] *Id.* at 346, 352 S.E.2d at 97.

[46] *Id*. at 345, 352 S.E.2d at 96.

[47] Civ. No. 11392, 1998 WL 246531, at *1 (Del. Ch. May 12, 1998).

Stone & Company, Inc. (DJS & Co.) and DJS Securities Limited (DJS Securities).[48]  The

parties fell out, and the Phoenix Group notified the Stones of their intent to dissolve the

corporations.[49]  Stockholders' agreements for DJS & Co. and DJS Securities defined the

parties' rights upon termination of those entities, including pricing of their interests upon

dissolution.[50]

After winning a bench trial as to the proper price for their interest under those

agreements, the Phoenix Group moved the Delaware court to enter judgment on the

contracts against the Stones, personally, as well as the corporations.[51]  Relevant to

Petitioners' arguments here, the Delaware court granted the Phoenix Group's motion based

on the following logic:

> The plaintiffs were awarded damages for breach of the promise to pay the purchase price for the Phoenix Group's stock provided in the stockholders' agreements.  Those agreements gave the Stones the option of buying the Phoenix Group's stock in their own or in the corporate name.  Since the Stones chose the latter, they argue that only the corporations are liable for the purchase price.
>
> The provisions of the stockholders' agreements on the purchase of the Phoenix Group's stock upon termination of the parties' partnership were part of the overall agreement between the Stones and the Phoenix Group when they went into the

---

[48] *Id.*

[49] *Id.* at *2.

[50] *Id.*

[51] *Silverstein v. David J. Stone & Co.*, Civil No. 11392, 1998 WL 409151, at *1 (Del. Ch. June 19, 1998).

investment banking business together. For tax reasons, they decided to use the Stones' corporations. The Stones as well as the corporations are parties to the stockholders' agreements. It does not follow from the fact that the Stones chose to buy the Phoenix Group's stock in the corporate name that only the corporations are liable for the agreed price. Considering the agreements' background and purpose, the Phoenix Group has a right to hold the Stones personally responsible for the performance of their individual promises that the Phoenix Group would receive the purchase price provided in the stockholders' agreements.[52]

This logic applies equally to the 2002 Partnership and the 2008 Stockholder Agreements at issue here. As in *Silverstein*, Ed, Colleen, Erin, and Sheila are parties to those agreements, and the agreements' background and purpose—providing for the management and operations of Legacy and Convenience Realty—justify holding those parties personally responsible for the performance of their individual promises that a departing stockholder or partner, in this case Kevin, would receive the protections and compensation agreed to in those agreements. Accordingly, the circuit court did not err by denying Petitioners' Rule 50(b) motion for judgment as a matter of law on this ground.

### D.   *Petitioners' Motion for a New Trial.*

Following the return of the jury verdict for Kevin on his claims of breach of fiduciary duty and breach of contract, Petitioners moved the circuit court for a new trial under Rule 59(a) of the West Virginia Rules of Civil Procedure. The circuit court denied

---

[52] *Id.*

Petitioners' motion.  With respect to our review of an order denying a motion for new trial, we have held that "the ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal when it is clear that the trial court has acted under some misapprehension of the law or the evidence."[53]  We now consider the assignments of error that Petitioners contend merit a new trial of Kevin's claims under that standard.

First, Petitioners assert that because the circuit court failed to grant their motion for summary judgment as to Kevin's claim of fraud against his sister, Colleen, the jury was "subjected to a flood of irrelevant, inadmissible, and highly prejudicial 'fraud' evidence and argument including—purely by way of example—'evidence' of [Colleen's] secret 'personal plan' to oust [Kevin] from his interest in the companies by dishonestly inducing him to enter in the [2002 Partnership and the 2008 Stockholder Agreements]." Petitioners also complain that the jury was exposed to evidence from 1995 regarding the earliest iterations of the companies' partnership and stockholder agreements, evidence that, according to Petitioners, the jury should never have heard.

Substantively, Petitioners' argument ignores Kevin's breach of fiduciary duty claim.  Evidence regarding a "secret 'personal plan'" by Colleen to freeze Kevin out

---

[53] Syl. Pt. 4, in part, *Sanders v. Georgia-Pac. Corp.*, 159 W. Va. 621, 225 S.E.2d 218 (1976).

of his interest in the business by inducing him to sign the 2002 Partnership and the 2008 Stockholder Agreements—both of which contain clauses that enabled the ultimate redemption of Kevin's stock and partnership interest—is relevant to Kevin's breach of fiduciary claim. As we have previously explained,

> Rule 401 provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under Rule 401, evidence having *any* probative value whatsoever can satisfy the relevancy definition. Obviously, this is a liberal standard favoring a broad policy of admissibility.[54]

Evidence that may make the existence of "an attempt to freeze or squeeze out"[55] a minority shareholder, such as evidence of Colleen's alleged personal plan to do so, is certainly relevant to Kevin's breach of fiduciary duty claim under the liberal standard of Rule 401. Thus, even accepting Petitioners' argument that the circuit court should have dismissed Kevin's fraud claim at summary judgment, the evidence Petitioners identify as prejudicial would have been relevant to Kevin's breach of fiduciary claim, and, therefore, admissible at trial.[56]

---

[54] *McDougal v. McCammon*, 193 W. Va. 229, 236, 455 S.E.2d 788, 795 (1995).

[55] Syl. Pt. 4, in part, *Masinter*, 164 W. Va. at 241, 262 S.E.2d at 433 (internal quotations omitted).

[56] W. Va. R. Evid. 402.

Petitioners' argument is procedurally unsound, as well. Petitioners use this assignment of error to re-argue their summary judgment motion regarding their fraud claim—a motion the circuit court denied. In most circumstances, including those here, the denial of a motion for summary judgment is an interlocutory order that may not be then appealed.[57] Applying that rule to this case, we see that at the time the "flood of irrelevant, inadmissible, and highly prejudicial 'fraud' evidence and argument" now decried by Petitioners was introduced, it was done so properly because the circuit court had concluded that there existed material issues of fact regarding the fraud claim to be resolved by the jury. That the jury ultimately found for Colleen on the fraud claim does not somehow render the evidence introduced by Respondents in support of that claim at trial "irrelevant, inadmissible, and highly prejudicial." Petitioners' argument is a snake swallowing its own tail and does not militate in favor of a new trial.

Petitioners next argue that the circuit court ignored two releases signed by Kevin in 2010, which they maintain should have precluded Kevin's fraud and breach of fiduciary duty claims. In 2010, Kevin requested that Legacy and Convenience redeem a small portion of his stock and partnership interests to provide him funds to settle his divorce. In April of that year, Kevin received an advance on the redemption price, in exchange for which he signed an Indemnity and Release Agreement. Then in September

---

[57] *See Gastar Expl., Inc. v. Contraguerro*, 239 W. Va. 305, __ n.11, 800 S.E.2d 891, 897 n.11 (2017).

2010, Kevin signed a Voluntary Stock Redemption and Release Agreement, and Legacy and Convenience issued him the remainder of the value of the redeemed shares and partnership interest.

Before this Court, Petitioners argue that the April and September 2010 releases are general releases that would release them from all liability to Kevin for his claims of breach of fiduciary duty and fraud. That is not, however, the position Petitioners presented to the circuit court. During trial, Petitioners' counsel represented that the April 2010 Indemnity and Release Agreement was "for anything having to do with the divorce, including the prenup." Later, Petitioners' counsel stated to the circuit court that "the releases in 2010 have nothing to do with termination of employment. There were having to do with us paying [Kevin] money for his—to get his divorce settlement." During the post-trial motions hearing, Petitioners' counsel represented to the circuit court that the releases "released any liability for actions such as, if we look at the first one, it clearly releases any claims for actions that [Colleen] or anybody else took with respect to involvement in his divorce"; and the releases "relieve any claims relating to any breaches of fiduciary duty claim that occurred before 2010." Also during the post-trial motions hearing, and directly contrary to their argument on appeal, Petitioners' counsel stated, "[t]here's no general release in this case."

Petitioners' shifting positions during trial fatally undercut their argument on appeal regarding the legal effect of the Indemnity and Release Agreement and the

Voluntary Stock Redemption and Release Agreement.[58]  Given the varying positions taken by the Petitioners at trial, they cannot now contend on appeal that those agreements release both Kevin's fraud and breach of fiduciary duty claims.  That is simply not the position they took at trial, and therefore they cannot now raise this argument in asserting error in the proceedings below.[59]

Finally, Petitioners argue that the circuit court abused its discretion by adopting a general verdict form, rather than the special verdict form they supplied.  Specifically, Petitioners complain that a new trial is warranted because the verdict form used by the circuit court did not list each of the defendants separately.  We disagree.[60]

---

[58] *See Haynes v. Rhone-Poulenc, Inc.*, 206 W. Va. 18, 27, 521 S.E.2d 331, 340 (1999).

[59] *Id.* at 27, 521 S.E.2d at 340; *see also Alexander v. Town & Country Estates, Inc.*, 535 F.2d 1081, 1082 (8th Cir. 1976) ("On appeal, we will not decide the case on a legal theory directly contrary to that advanced by appellants at trial.").

[60] Rule 49(a) of the West Virginia Rules of Civil Procedure states:

> **Special verdicts.** — The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. If in so doing the court omits any

A trial court exercises considerable discretion in determining whether to give special interrogatories and verdicts to a jury, unless required to do so by statute.[61] This Court applies an abuse of discretion standard to a trial court's decision regarding a verdict form.[62] We have previously explained that the criterion for determining whether a circuit court has abused its discretion with regard to a verdict form "is whether the verdict form, together with any instruction relating to it, allows the jury to render a verdict on the issues framed consistent with the law, with the evidence, and with the jury's own convictions."[63]

As to Petitioners' first argument—that the circuit court erred by not listing each defendant individually under each claim—Petitioners have not offered any authority finding this to be an abuse of discretion by a trial court.[64] During oral argument, this Court

issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict.

[61] *See* Syl. Pt. 8, *Barefoot v. Sundale Nursing Home*, 193 W. Va. 475, 457 S.E.2d 152 (1995).

[62] *See* Syl. Pt. 4, *Perrine v. E.I. du Pont de Nemours & Co.*, 225 W. Va. 482, 694 S.E.2d 815 (2010).

[63] *Adkins v. Foster,* 195 W. Va. 566, 572, 466 S.E.2d 417, 423 (1995) (citing *See* 9A Charles Allan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* 2d § 2508 (1995); *Martin v. Gulf States Utilities Co.,* 344 F.2d 34 (5th Cir. 1965); and *McDonnell v. Timmerman,* 269 F.2d 54 (8th Cir. 1959)).

[64] We acknowledge that the circuit court did not instruct the jury that, should they find one defendant, for example Ed, liable for breach of fiduciary duty, the other sibling

41

invited Petitioners to offer some authority for this proposition, but Petitioners could not. This is not surprising, considering that although "there are frequent judicial statements in the reported cases that the [trial court's] decision whether or not to use a special verdict under Rule 49(a) is reviewable . . . there appears never to have been a reversal on this ground" in the federal courts. [65]

Practically, as to the breach of contract claim, Petitioners complain that by "lump[ing] together" the corporate and individual defendants, the verdict form erroneously allowed the jury to find the individual defendants liable for breaches of the 2002 Partnership and 2008 Stockholders Agreements. This, they argue, invited the jury to render a verdict that was not "consistent with the law [and] the evidence"[66] because the siblings cannot be individually liable for those breaches. As detailed above, however, Petitioners' argument is incorrect. The siblings were parties to those agreements and we have found that they may be held liable, individually, for breaching them. Thus, the verdict form used by the circuit court did not invite the jury to return a verdict inconsistent with the law or the evidence in this case.

---

defendants were not necessarily liable for that claim, as well. However, we also recognize that the instructions proffered by the Petitioners likewise omitted this type of explanation.

[65] 9B Arthur R. Miller, *Federal Practice and Procedure: Civil* § 2505 (3d Ed. April 2017 update).

[66] *Adkins*, 195 W. Va. at 572, 466 S.E.2d at 423.

Also with regard to the breach of fiduciary duty claim, Petitioners argue that the circuit court's verdict form prevented the jury from making individualized assessments of the liability of Colleen, Ed, Erin, and Sheila. This, they argue, is particularly important in the case of Sheila, whom they contend had no involvement in the termination of Kevin's employment or redemption of his shares or partnership interest.

But, as Kevin points out, that is not the case: Sheila signed the Legacy corporate resolution redeeming his shares. She participated in the development of the Bridgeville and Oakland properties to the exclusion of Kevin. She was a partner in BRLP, and she received a distribution from ISSH in June 2012 (a distribution that Kevin did not receive, although he was a shareholder in ISSH at the time), which she then contributed to BRLP to obtain an extension of a development-related deadline at the Bridgeville property. She was also a partner in CRLP, and received transfer of the Oakland property from Convenience Realty only to transfer that property to CRLP as a capital contribution. Again, the siblings, including Sheila, did not inform Kevin of those actions, all of which occurred or were contemplated while Kevin was still a shareholder in Legacy and ISSH and a partner in Convenience Realty. Thus, it is not a foregone conclusion, as Petitioners' argument implies, that the jury would have returned a verdict in Sheila's favor on this claim had the jury been asked to make a finding as to her liability, individually. In light of this record evidence, we cannot conclude that the circuit court's verdict form invited a verdict inconsistent with the facts of this case.

43

Given the complexity of the theories and facts presented to the jury in this case, we believe that a special verdict form may have been preferable. Nevertheless, as we observed in *Barefoot*, "the refusal to do so does not provide an independent basis for reversing an otherwise valid judgment."[67] Ultimately, we cannot say, on the record provided and in light of this Court's conclusions with regard to Petitioners' arguments in support of their post-trial motion for judgment as a matter of law, that the circuit court's form produced a verdict on the issues framed that was inconsistent with the law, the evidence, or the jury's own convictions. Nor will we substitute our preference for the circuit court's "considerable discretion"[68] on this point. Consequently, we find that a new trial in this case is not warranted based on the circuit court's verdict form.

## E.     *Attorneys' Fees*

Following trial, Kevin sought an equitable award of attorneys' fees of approximately $2 million. The circuit court then heard oral argument from the parties in August 2016 and granted Kevin's motion during the hearing. It later memorialized its ruling in a December 2016 order. Petitioners now challenge that order and the $1,517,996.40 fee award.

---

[67] *Barefoot*, 193 W. Va. at 493, 457 S.E.2d at 170.

[68] *Id.* at 490, 457 S.E.2d at 167.

As we stated in *Sally-Mike Properties v. Yokum*, parties may not generally seek attorneys' fees as costs in excess of the "nominal statutory amounts provided by *W. Va. Code,* 59-2-14 [1960]."[69] West Virginia generally follows the American rule, under which "each litigant bears his or her own attorney's fees absent a contrary rule of court or express statutory or contractual authority for reimbursement."[70] We do recognize a narrow, equitable exception to this general prohibition on the recovery of attorneys' fees, however, "when the losing party has acted in bad faith, vexatiously, wantonly or for oppressive reasons."[71] A party may demonstrate the requisite bad faith "in conduct leading to the litigation or in conduct in connection with the litigation."[72] We review a circuit court's decision to award attorneys' fees for abuse of discretion.[73]

After reviewing the circuit court's statements during the post-trial motion hearing and December 2016 order, we are left with the firm conviction that the circuit court abused its discretion by granting Kevin's motion for attorneys' fees without placing in the record the factual basis for the award. "We grant trial court judges wide latitude in conducting the business of their courts. However, this authority does not go unchecked,

---

[69] Syl. Pt. 1, in part, *Sally-Mike Prop. v. Yokum*, 179 W. Va. 48, 365 S.E.2d 246 (1986).

[70] *Id.*, Syl. Pt. 2, in part.

[71] *Id.*, Syl. Pt. 3, in part.

[72] *Id.* at 51, 365 S.E.2d at 249.

[73] *Beto v. Stewart*, 213 W. Va. 355, 359, 582 S.E.2d 802, 806 (2003).

and a judge may not abuse the discretion granted him or her under our law."[74] Consequently, the "discretion that is normally given to a trial court's procedural decisions does not apply where the trial court makes no findings or applies the wrong legal standard."[75]  This is because, "[i]n the absence of adequate findings of fact and conclusions of law, we are unable to intelligently discharge our limited appellate role to determine that the circuit court did not abuse its discretion."[76]

That is the case here.  While the circuit court stated during the August 2016 hearing that the record was "full of evidence of vexatious and oppressive conduct," it failed to support that conclusion with specific testimony or exhibits offered during trial.  Instead, it merely referenced the term "squeeze out," deemed the various business enterprises involved in the lawsuit to be "very large," and labeled the matter  a "family quarrel[] basically at [its] worst."  The circuit court's December 2016 order merely restates its conclusion from the August 2016 hearing that the Petitioners engaged in vexatious and oppressive, pre-litigation conduct.  The circuit court's order highlights examples of potentially oppressive majority shareholder conduct, then summarily states that evidence

---

[74] *Lipscomb v. Tucker Cty. Comm'n.,* 206 W. Va. 627, 630, 527 S.E.2d 171, 174 (1999).

[75] *State ex rel. Med. Assurance of W. Va. v. Recht*, 213 W. Va. 457, 464, 583 S.E.2d 80, 87 (2003) (citations and alterations in original omitted).

[76] *Shafer v. Kings Tire Serv., Inc.*, 215 W. Va. 169, 177, 597 S.E.2d 302, 310 (2004).

offered in this case fits those examples. [77] The circuit court, however, did not take the necessary step of setting forth findings of fact and conclusions of law necessary to support that conclusion. Without sufficient findings of fact and conclusions of law, we cannot determine on appeal whether the circuit court did or did not abuse its discretion in granting Kevin's motion for attorneys' fees under *Sally-Mike*.

Petitioners also argue that they were not given an opportunity to address the reasonableness of the fee award itself. As we have previously observed, "[t]he determination of whether fees are reasonable is simply a fact driven question that must be assessed under the *Pitrolo* factors."[78] As set out in Syllabus Point 4 of *Pitrolo*, those factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.[79]

---

[77] The examples of oppressive conduct cited by the circuit court are drawn from an article drafted and self-published by Kevin's counsel. On remand, the circuit court should afford this article only the weight it is due after analyzing the issues presented under the applicable law of this State.

[78] *Multiplex, Inc. v. Town of Clay*, 231 W. Va. 728, 738, 749 S.E.2d 621, 631 (2013) (internal quotations and citation omitted).

[79] *Pitrolo*, Syl. Pt. 4, in part, 176 W. Va. at 190, 342 S.E.2d at 156.

47

Additionally, "in order for a circuit court to determine those facts, it must allow the parties to present evidence on their own behalf and to test their opponents' evidence by cross-examination . . . ."[80]

Here, the circuit court summarily awarded Kevin eighty percent of the attorneys' fees he requested without first permitting Petitioners to present their own evidence or to test Kevin's evidence by cross-examination. In light of this omission, we find that an additional hearing is needed regarding the reasonableness of the attorneys' fees requested by Kevin so that the circuit court can perform the requisite analysis.[81] Moreover, even had the circuit court conducted a proper *Pitrolo* hearing, the circuit court's single-sentence analysis of four of the twelve *Pitrolo* factors in its December 2016 Order is insufficient to permit this Court to perform a meaningful review on appeal.[82]

Accordingly, we reverse the determination of the circuit court that an award of attorneys' fees is appropriate in this case for lack of findings sufficient to permit meaningful appellate review, and remand this matter to the circuit court with direction to

---

[80] *Id.*

[81] *See W. Va. Dep't of Trans. v. Veach*, 239 W. Va. 1, __, 799 S.E.2d 78, 91 (2017) (remanding for *Pitrolo* hearing to provide parties the opportunity to address the reasonableness of the fee award, itself).

[82] *Multiplex*, 231 W. Va. at 739, 749 S.E.2d at 632 (stating that "[w]hile [the] court is not required to make detailed findings on each and every element of the *Pitrolo* test, some being irrelevant in a given situation, the court must make findings sufficient to permit meaningful appellate review").

enter an order containing appropriate findings of fact and conclusions of law, as may support its decision to award attorneys' fees, or to deny Kevin's motion therefor.[83] If the court determines that attorneys' fees are to be awarded, the court shall conduct a *Pitrolo* hearing and enter an order containing sufficient findings of fact and conclusions of law with respect to the reasonableness of the amount of the award to allow meaningful appellate review should either party elect to file an appeal.

## F. *Prejudgment Interest*

In its December 7, 2016 post-trial order, the circuit court awarded Kevin $959,452.46 in prejudgment interest from September 11, 2012, (the date Kevin's shares were redeemed) under West Virginia Code § 56-6-31 (2012).[84] The circuit court explained the prejudgment interest award as follows:

> The Court finds that the legal basis for this action is primarily tortious in nature. Therefore the net amount of the jury verdict in this action, $3,233,911.00, is subject to prejudgment interest from September 11, 2012, the date the Defendants acted to redeem Plaintiff's shares, through the approximate date of entry of the judgment. The Court further

---

[83] Before the circuit court, the parties extensively briefed the question of whether Kevin was entitled to an award of attorneys' fees under *Sally-Mike*'s equitable exception to our general rule that each litigant is to bear his or her own costs. Considering this extensive briefing, we do not require the circuit court on remand to conduct further briefing or argument on this preliminary question. It may rule on the briefs and record already before it. However, as explained in the body of this opinion, should the circuit court conclude that Kevin is entitled to attorneys' fees under *Sally-Mike*, it must then conduct a *Pitrolo* hearing and permit each party to present evidence, and test its opponent's evidence, as to the reasonableness of the fee award.

[84] Section 56-6-31 was amended in 2017, effective January 1, 2018. The amendment was stylistic in nature and does not impact our analysis.

finds that the appropriate interest rate applicable to calculate prejudgment interest is the statutory minimum rate of 7% per annum which results in interest accumulated for the Plaintiff as of December 5, 2016 to be $959,452.46.

On appeal, Petitioners raise two arguments in opposition to the prejudgment interest award. First, Petitioners argue that the jury verdict did not represent "special damages," as defined in § 56-6-31(a), and so may not be the basis for an award of prejudgment interest under that section. Alternatively, Petitioners argue that because the 2008 Stockholders and 2002 Partnership Agreements specify rates of interest applicable to payments for share and interest redemptions, § 56-6-31(a) required the circuit court to apply those rates to determine the amount of prejudgment interest due to Kevin, rather than the statutory default prescribed by that code section, and set by this Court at seven percent for judgments entered in 2016. Kevin responds that his damages are, in fact, "special damages" subject to prejudgment interest under § 56-6-31, and that the circuit court correctly applied the statutorily prescribed rate of interest, rather than those found in the 2008 Stockholders and 2002 Partnership Agreements.

"In reviewing a circuit court's award of prejudgment interest, we usually apply an abuse of discretion standard."[85] Nevertheless, if a "circuit court's award of prejudgment interest hinges, in part, on an interpretation of our decisional or statutory law,

---

[85] Syl. Pt. 2, in part, *Hensley v. W. Va. Dep't of Health & Human Res.*, 203 W. Va. 456, 508 S.E.2d 616 (1998).

we review *de novo* that portion of the analysis."[86]  We find that the circuit court improperly interpreted our decisional and statutory law to determine that the entire jury verdict in this case, net of offsets, constituted "special damages," subject to prejudgment interest.

To justify the award of prejudgment interest on the net amount of the verdict, the circuit court characterized this matter as one sounding primarily in tort.  Given the dual nature of the jury verdict in this case, we accept that premise and so turn our attention to West Virginia Code § 56-6-31, which controls awards of prejudgment interest in tort actions.[87]  That section provides, in pertinent part:

> Except where it is otherwise provided by law, every judgment or decree for the payment of money . . . entered by any court of this State shall bear interest from the date thereof, whether it be so stated in the judgment or decree or not: Provided, That if the judgment or decree, or any part thereof, is for special damages . . . the amount of the special . . . damages shall bear interest at the rate in effect for the calendar year in which the right to bring the same shall have accrued[.] . . . Special damages includes lost wages and income, medical expenses, damages to tangible personal property and similar out-of-pocket expenditures, as determined by the court.

Thus, under the portions of § 56-6-31 relevant here, a party may recover prejudgment interest only on "special damages," which include "lost wages and income,

---

[86] *Id*.

[87] West Virginia Code § 56-6-27 (2012), however, controls awards of prejudgment interest in cases founded in contract.  *See Ringer v. John*, 230 W. Va. 687, 690, 742 S.E.2d 103, 106 (2013) ("West Virginia Code § 56-6-27 (2012), rather than West Virginia Code § 56-6-31, provides for prejudgment interest in actions founded on contract.").

medical expenses, damages to tangible personal property and similar out-of-pocket expenditures."[88]  More broadly, to qualify for an award of prejudgment interest, such damages must be an "ascertainable pecuniary loss[,]"[89] that is, they must be "certain or capable of being rendered certain by reasonable calculation."[90]

Again, accepting for argument's sake the circuit court's characterization of this action as one sounding in tort, we are left with the question of whether the entirety of the damages awarded to Kevin on the facts of this case are special damages.  We find that they are not.  In his second amended complaint, Kevin pleaded as damages for his claim of breach of fiduciary duty against his siblings "compensatory damages, consequential damages for *inter alia* the loss of his share of company distribution and earnings and loss of the benefits of continuing to hold an ownership interest in the Family Business" in addition to fees, costs, and punitive damages.  He did not specifically state, as required by Rule 9(g) of the West Virginia Rules of Civil Procedure, that he claimed "special damages," or that he sought categories of damages identified in § 56-6-31 as "special damages," such as lost wages or income, out-of-pocket expenses, or medical bills.

---

[88] W. Va. Code § 56-6-31.

[89] *Capper v. Gates*, 193 W. Va. 9, 19, 454 S.E.2d 54, 64 (1994); *see also Grove By and Through Grove v. Myers,* 181 W. Va. 342, 345 n.4, 382 S.E.2d 536, 540 n.4 (1989).

[90] *Grove By & Through Grove*, 181 W. Va. at 347, 382 S.E.2d at 541.

We note that in *Capper v. Gates*, this Court stated in dicta that a compensatory damage award on plaintiff's fraud and professional negligence claims "offer[ed] a definite basis for determining prejudgment interest."[91] The facts of this case differ from those in *Capper*. There, the jury's compensatory damage award was commensurate with a readily calculable loss suffered by the plaintiff.[92]

Similarly, in *Pauley v. Gilbert*, our only case to touch upon the availability of prejudgment interest for compensatory damages awarded on a breach of fiduciary claim, the compensatory damages awarded roughly correlated to the amount of funds that the fiduciary, the plaintiff's mother, plundered from the plaintiff's trust.[93] Thus, plaintiff's compensatory damages were readily calculable at the time of trial. Additionally, the pre-judgment interest issue before this Court in *Pauley* was the proper interest rate, and not the foundational question of whether the plaintiff's tort damages were capable of being rendered certain by reasonable calculation, which is the issue here.

The facts of this case contrast with those of *Capper* and *Pauley*. Here, the jury valued Kevin's tort damages at $5,053,111, an amount that does not correlate with any figure offered by either sides' experts. And, based on the record, we cannot determine the

---

[91] *Capper*, 193 W. Va. at 19, 454 S.E.2d at 64.

[92] *Id*. at 17, 454 S.E.2d at 62.

[93] *Pauley v. Gilbert*, 206 W. Va. 114, 117–18, 522 S.E.2d 208, 211–12 (1999).

jury's calculus behind this damage award. Certainly, an allocation of the verdict between Kevin's breach of contract and fiduciary claim would have assisted the Court in determining whether Kevin's tort damages are special damages, and in resolving others of the parties' arguments on appeal. However, neither party objected to the dual nature of the verdict, nor asked the circuit court to request the jury to allocate the verdict prior to dismissing them.

In any case, "[w]here, in the trial of an action at law before a jury, the evidence is conflicting, it is the province of the jury to resolve the conflict, and its verdict thereon will not be disturbed unless believed to be plainly wrong."[94] Here, Petitioners do not assert that the jury's verdict was plainly wrong, and we will not cross the border into the jury's province uninvited. Consequently, on the singular facts of this case, we find that Kevin's tort damages, which the jury found to be $5,053,111, were not readily calculable or certain at the time of trial. Thus, the circuit court erred by deeming the net amount of the jury verdict in this action, $3,233,911, to be "special damages" subject to prejudgment interest under § 56-6-31. Accordingly, we reverse that portion of the circuit court's December 7, 2016 order granting Kevin $959,452.46 in prejudgment interest.

---

[94] Syl. Pt. 3, *Pinnacle Min. Co. of N. W. Va. v. Duncan Aircraft Sales of Fla., Inc.*, 182 W. Va. 307, 387 S.E.2d 542 (1989) (citing Syl. Pt. 2, *French v. Sinkford,* 132 W. Va. 66, 54 S.E.2d 38 (1948)).

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's denial of Petitioners' motion for judgment as a matter of law; affirm the circuit court's denial of Petitioners' motion for a new trial; reverse the circuit court's award of prejudgment interest to Respondent; and reverse the circuit court's award of $1,517,996.40 in attorney's fees to Respondent. We remand this case to the circuit court for further proceedings on the issue of Respondent's entitlement to attorney's fees, and, if warranted, on the reasonable amount of those fees and the entry of an appropriate order resolving those issues that comports with this Court's precedents, including *Pitrolo*.

Affirmed, in Part; Reversed, in Part; and Remanded with Directions.